## Klein Estate

*Smith, Aker, Grossman, Hollinger & Jenkins,* by *M. Paul Smith* for accountant.

*Irwin S. Rubin*, for primary beneficiary.

*Roger M. Whiteman*, for secondary beneficiary.

TAXIS, J., May 3, 1974.—The reason for the filing of the present account is that no account has been filed by the trustee since February of 1962, and also to afford the parties in interest an opportunity to present several matters for determination. . .

Twenty-two objections to the account have been filed by the Board of Global Ministries of the United Methodist Church, which is the corporate successor to the excess income beneficiary designated by testator. A hearing on the objections was held on November 21, 1973, and argument was held and briefs were submitted on the issues on January 14, 1974.

Jacob W. Klein died on June 30, 1920, leaving a will dated November 1, 1913, and two codicils thereto, dated December 18, 1914, and April 16, 1920. The problem presented for determination requires an examination of the entire will and the codicils, and revolves around the use and payment of income by the trustee pursuant to clauses (c) and (d) of item 4 of the will.

Item 4 of decedent's will, in parts pertinent, reads as follows:

"(B) All the rest, residue and remainder of my trust estate, I direct my said Trustee to keep safely invested forever, and to pay out of the net income thereof as follows:

"(a) Eleven Hundred Dollars, in semi-annual payments to the Trustees of said Christ's United Evangelical Church, One Hundred Dollars for the general use of the Church, and the balance One Thousand Dollars to be applied towards paying the salary of the Pastor thereof, so long as he is not also the Pastor of any other Church, but may at the same time serve as

Pastor of any new Mission of said Christ's United Evangelical Church.

"(b) One Hundred Dollars in like payments to said Trustees to be applied towards paying the salary of the Sexton of said Church.

"(c) Also such sum as may be necessary to keep the Church Building *insured,* to rebuild the same in case of destruction by fire or storm, *and to keep the same in complete and proper repair, inside and outside, and also to keep in proper repair the fences and grounds and especially my burial lot in the cemetery; also to keep Parsonage in proper repair, and insured.*

"(d) The balance to pay to the Church Extension Society of the United Evangelical Church, located at Harrisburg, Pennsylvania.

"I do hereby specifically order and direct the lot of land, Church building and appurtenances above devised, and Parsonage and lot of ground, and the income above bequeathed, to be paid from time to time into the hands of the Trustees of said Christ's United Evangelical Church, shall be for the sole and exclusive use of said Church for the purposes aforesaid, and said Church and Parsonage and lot of ground, shall always be and remain under and subject to the sole and exclusive control of the officers and members of said Congregation as it may from time to time exist. This control by the Congregation shall not be surrendered, but shall remain in it despite an attempted surrender, nor shall the property ever be sold under any pretext or for any reason or purpose whatever. *Neither shall the profits nor the income at any time come under, or be subject to, the control or regulation of any synod, conference, bishop or other Church authority, except the said Congregation itself.*" (Italics supplied).

In matters of testamentary interpretation and con-

struction, certain basic rules govern, and bear mention here. First, we seek at all times and in all situations to effectuate the legal intent of the testator, when it is ascertained. Second, although wills are ambulatory and *apply* only as of the death of the testator, logic nonetheless dictates that their overall meaning must be determined as of the time the will was drawn, and also from testator's actions during his life, where relevant. Application of this rule is especially appropriate in the case, as here, of very long or perpetual trusts, where by passage of time the governing instrument or will becomes old and to an extent obsolete in some of its provisions. But it certainly does no violence to the expressed intent of a testator to carry out his wishes in more modern or efficient ways than were known to him. A great number of devices, processes and procedures utilized in 1974 to successfully operate and maintain a church building, or any building, were unknown to decedent; this does not make their use a violation of the terms of his will. In 60 years there have been substantial changes both in the problems confronting the trustee, and the means available to solve them. There were, of course, ceilings in 1913, but there were no acoustical ceilings; there was fire insurance, but very little if any public liability insurance; there was some hard surfacing available for public roads, but it was not commonly utilized for private roads, where travelers were mainly horses and horse-drawn vehicles; the use of power mowers, rollers and trimmers, to save and speed up labor, was still in the future; and so on.

Objector would have us construe testator's language narrowly and literally, and exclude from its scope any expenditure for the church which could in any way be characterized as an improvement or a capital

addition. However, we are not inclined to read testator's language so narrowly. It is overwhelmingly clear from the will, read as a whole, that Christ's United Evangelical Church was and is the primary and paramount object of testator's bounty; it was, indeed, his great pride. Therefore, his directions and provisions for it should be construed accordingly. The cumulative effect of his instructions to insure the church and parsonage, to rebuild the same in case of destruction, and to keep them in complete and proper repair, inside and outside, including the fences and grounds appurtenant thereto, is that any expenditure required or appropriate to maintain the physical plant of the church in condition to perform its function, in the light of current needs and circumstances, is proper. Specifically, we see nothing in the will or anywhere in this record to justify objector's position that the "repairs" permissible under the will must be restricted to those which an accountant or tax counsellor would characterize as such, in distinguishing them from capital investments or improvements.

It is now in order to consider the objections seriatim. All appear in the objections filed under "Objection 2," and only the letters identifying the individual objections will be referred to. (Omitted letters refer to objections that have been withdrawn).

(a) "May 8, 1964—C. Raymond Lukens—labor and material to install acoustical ceiling and lower light fixtures—$1,200.00."

The accountant's testimony established that these items were done on the recommendation of an engineer to avoid the necessity of painting and plastering, and further to reduce the heating expense and provided better lighting. This addition has proven to be of permanent value and was consistent with the objective of the trustee to keep the property

in first-class condition. The objector's argument is that the acoustical ceiling was an *improvement* rather than a repair or necessary replacement. However, we do not believe that the trustee exceeded its discretion in choosing a modern and efficient way to solve, at one stroke, several continuing problems of maintenance. Objection (a) is dismissed.

(b)(k) "August 25, 1964—public liability insurance —$63.95—September 12, 1967—public liability insurance—$281.00."

The accountant's evidence establishes that this insurance was obtained under a blanket liability insurance policy protecting both church officials and the corporate trustee at minimum expense; section 7133 of the Probate, Estates and Fiduciaries Code gives trustees the power to carry liability insurance in the same manner as section 3313 authorizes such action for personal representatives. Section 3313 provides as follows:

§3313. Liability insurance.

"The personal representative, at the expense of the estate, may protect himself, his employes and the beneficiaries by insurance from liability to third persons arising from the administration of the estate."

Objector complains that decedent's will allowed the use of income to keep the buildings insured so that they might be rebuilt in case of destruction *by fire or storm*, but contends that this does not include public liability insurance which covers injuries to third persons.

In light of the fact that exemption from tort liability has now been removed from charities, the court is satisfied that this insurance is in a reasonable amount and is appropriate coverage for this trust. Objections (b) and (k) are dismissed.

(c) "June 15, 1965—J. T. Smith—install new lights and fixtures—$436.00."

The accountant's evidence establishes that four electric lights and an automatic switch were installed so that the parking area would be lighted when church services were conducted at night. These four lights did not replace prior lights and the objector complains that, since they did not take the place of any prior lights, the installation was an addition to the church facilities and an improper expenditure of income.

Such expenditure was prudent as a safety measure. This objection is dismissed.

(d), (o), (q) and (v) as follows:

"2(d) July 27, 1965—Green Lane Contracting Co., Inc.—black top driveway—$1,300."

"2(o) August 13, 1969—Spring Mount and Yoder Paving Co.—paving for driveway—$537.00."

"2(q) August 6, 1970—Spring Mount and Yoder Paving Co.—paving per contract—$1,667.25."

"2(v) Trustees of Christ Church—c/o cemetery lot—$450.00."

The testimony of the accountant establishes that the expenditure for black-topping the original driveway and parking area was done to cover potholes and to eliminate dirt which was tracked into the church and the parsonage. The second expenditure was top-dressing on the original black top, and the third was a driveway by the side of the cemetery over what was formerly a lawn. The $450 expended for the cemetery was for maintenance of the cemetery and grounds. These were needed to keep property in reasonably good condition. These objections are dismissed.

(e) "November 8, 1965—Christ Evangelical Congregational Church—reimbursement for chaise—$99.14."

(n) "August 13, 1969—Christ Church—reimbursement for wooden chairs—$62.20."

Accountant's testimony establishes that these represent a prudent solution of a problem which had arisen

as the wooden chairs would fall apart, actually causing on one occasion a bad accident. These objections are dismissed.

(f) "September 15, 1966—Green Lane Contracting Co., Inc.—electric work, trimming and removing trees —$2,387."

The accountant takes the view and the testimony establishes that this expenditure was designed to make the parsonage more livable. Objection dismissed.

(j) "August 25, 1967—Green Lane Contracting Co., Inc.—install drainage system—$220.00."

The accountant's testimony establishes that this was done to make the parsonage more livable. Objection dismissed.

(m) "October 2, 1968—Levitz Furniture—merchandise—$885.00."

The accountant's testimony indicates that this expenditure covered wall to wall carpeting in the parsonage and was installed because the floors were old and needed refinishing. This was a proper use of income, since even objector would have to concede that the alternative, refinishing the floors, would have been a "repair." Objection dismissed.

(g) "May 25, 1967—Meetinghouse Garage—Bolens mower and roller—$770.00."

(h) "June 13, 1967—Meetinghouse Garage—Goodall trimmer—$84.40."

(s) "May 15, 1972—Meetinghouse Garage—car repair $39.95."

Accountant's testimony establishes that these expenditures were for lawn and grounds maintenance. This expenditure was proper and these objections are dismissed.

(i) "July 19, 1967—Green Lane ·Contracting Co., Inc.—placing of hedge—$460.00."

Accountant's testimony establishes that this was a hedge used for the replacement of an iron fence, which expenditure was required mainly by damage caused by automobiles to the iron fence along the highway. This was a prudent use of funds and this objection is dismissed.

(1) "February 6, 1968—Curtis H. Clemmer—new main entrance—$1,528."

Accountant's testimony establishes that the main entrance to the church was in a very poor condition and unbecoming for a church and was restored for this reason. This is in conformity with testator's direction to keep the church building in "complete and proper repair, inside and outside." Objection dismissed.

(p) "May 13, 1970—R. M. Alderfer—painting and paneling basement—$1,937.50."

The testimony of the accountant is that this painting and paneling in the basement was essential for the maintenance of the inside of the church, especially for the work of expanding Sunday School. Objection dismissed.

(t) "September 25, 1972—Curtis H. Clemmer—partition work—$365.00."

Objection dismissed, for reasons set forth previously.

There is another compelling reason why these objections must be dismissed. Examination of the records of the first five accounts filed by the trustee, based on over 40 years of administration, shows numerous disbursements of income for purposes which, according to objector's present position, would be improvements or capital expenditures and not repairs. The only objections ever filed were to the fifth account in 1962, and related to renovations to the parsonage garage and the cemetery property. These objections

were dismissed, and no appeal was taken. The trustee throughout the administration of the trust, and particularly in connection with the transactions since 1962 here under attack, was guided by what expenditures were permitted before, and it was entitled to rely on the past record.

Usually, when the parties interested in an estate left to them by will agree upon the meaning of its provisions, and distribution occurs in accordance therewith, their interpretation will not be disturbed by a court. In some circumstances, even a construction which is erroneous will not be changed; however, the rule is especially appropriate where the language in question is general, vague, or otherwise not entirely clear and definitive. See 40 P. L. Encyc. §336. In any event, the actions of the trustee now before the court cannot, by any stretch of the imagination, be viewed as the supine neglect which is the basic requisite for a surcharge.

We perceive that the principal difficulty confronting objector, in this account as compared to previous accounts, is that heretofore it has received substantial funds as the excess income beneficiary (totaling $93,820.83 between 1920 and 1962), but has received no income whatever during the period of the sixth account. The objector is, actually, the rather remote corporate successor (the survivor of successive mergers) to the Church Extension Society of the United Evangelical Church, which was the excess income beneficiary named by and known to testator; and it can reasonably be assumed that thereby it would have even less claim to testator's bounty, as against the primary beneficiary, than the original excess income beneficiary. Nevertheless, there is excess income on hand, and the court is satisfied that a portion of the same should be distributed; therefore, $2,500 is hereby

awarded to the excess income beneficiary out of the balance of income for distribution reflected in the account.

Subject to the distributions heretofore properly made and consistent with the views expressed in this adjudication, the net ascertained balances of principal and income are awarded back to the trustee for further administration of the trust.

Power and authority are hereby given the accountant to make the necessary assignments and transfers of the unconverted investment securities herein awarded in kind.

The account is confirmed, and it is hereby ordered and decreed that Continental Bank, testamentary trustee, as aforesaid, forthwith pay the distributions herein awarded.

And now, May 3, 1974, this adjudication is confirmed nisi.